## HORATIO H. LINDSEY *v*. THE ATTORNEY-GENERAL.

1. QUO WARRANTO.—At common law the writ of quo warranto is in the nature of a writ of right for the king, against him who claims or usurps an office, franchise, or liberty, to inquire by what authority he supports his claim, in order to determine the right.   See 2 Black. Com. 262; 7 Comyn's Dig. 190.

2. SAME: INFORMATION IN NATURE OF.—Owing to the great length of the process, and the delay occasioned by the practice which prevailed under it, the ancient writ of quo warranto has fallen into disuse, and the more modern method of proceeding, by information in the nature of a writ of quo warranto, in the name of the attorney-general, substituted; and now, this latter proceeding can be supported in all cases in which the ancient writ was maintainable.

3. COMMON LAW: REMEDIES ALLOWED BY, HOW ENFORCED.—In ascertaining the nature and extent of rights, and the appropriate remedies to enforce them, we may look to the rules of the common law; but in determining the tribunal in which a specific remedy is to be enforced, we must look alone to our own constitution and laws; and therefore, although by the common law of England, the writ of quo warranto might have been grantable only at the pleasure of the king, yet being an appropriate remedy to enforce certain legal rights, it will be granted by the common law courts of this State.

4. QUO WARRANTO: PROPER REMEDY TO RECOVER POSSESSION OF AN OFFICE.—There is a legal remedy for every legal right. A person constitutionally eligible, has a legal right to an office to which he has been duly elected; and hence, he is entitled to a writ of quo warranto, to oust him who withholds the office, there being no other remedy provided by law for that purpose.

5. SAME: MAY ISSUE IN NAME OF ATTORNEY-GENERAL.—The attorney-general is the proper officer in whose name an information, in the nature of a writ of quo warranto, should be prosecuted, in order to award to the relator the enjoyment of an office improperly withheld from him.

6. SAME: PROCESS: PRACTICE.—Process, upon an information in the nature of a writ of quo warranto, to oust the usurper of an office, may be issued in term time, and made returnable to the same term of the court.

7. SAME: PRACTICE.—Where the process, issued upon an information in the nature of a writ of quo warranto, contains a statement of what is alleged in the information, it is unnecessary that a rule nisi, stating the objections to the defendant's holding the office, should accompany it.

8. EXECUTIVE DEPARTMENT: COMMISSIONS TO OFFICERS.—The courts will take

judicial notice of the changes in the Executive department of the State, and of the date of the inauguration of the Governor; and a commission, which is uncertain in omitting to state the date of the election of an officer by the legislature, may be rendered certain in that respect, by a reference to the date of the inauguration of the Governor who signed it.

9. OFFICER: PENSION AGENT.—A pension agent of the United States is not an officer of the Federal Government, and he may lawfully hold an office of trust or profit under this State.

APPEAL from the Circuit Court of Hinds county. Hon. John I. Guion, judge.

At the March Term, A. D. 1854, of the Circuit Court of Hinds county, and on the 13th day of said month, David C. Glenn, Attorney-General of this State, on the relation of David N. Barrows, filed in said Court a petition in the following words and figures:

### THE STATE OF MISSISSIPPI, HINDS COUNTY.

### Circuit Court, March Term, 1854.

To the Hon. J. I. Guion, Judge of the Third Judicial District: David C. Glenn, Attorney-General of the State of Mississippi, and prosecuting on behalf of said State, in the behalf, on the relation of David N. Barrows, a citizen of said county and State, comes here into the court aforesaid, to wit, the Circuit Court of said county and State, for the term aforesaid, and on the 13th day of March, 1854, and for the said State of Mississippi, on the relation aforesaid, gives the court here to understand, and be informed that Horatio H. Lindsey, of said county and State, for the space of four weeks now last past or more, hath used, and does still use, without warrant or grant of law, the following liberties and franchises, to wit: the said Horatio H. Lindsey, without warrant or authority of law, hath usurped the office of clerk of the penitentiary of said State, and as an incident thereto, or appendage, the office of clerk or secretary of the Board of Inspectors of said penitentiary, together with all the privileges, immunities, and emoluments pertaining thereto; and hath refused and still refuses to vacate said office, and surrender its privileges, immunities, and emoluments to the person rightfully entitled by law to have, hold, and enjoy said office, and the aforesaid incident, or appendage thereto, and the privileges, immunities, and emoluments belonging

to the same; of all which liberties, privileges, and franchises, aforesaid, the said Horatio H. Lindsey, during all the time aforesaid, hath usurped and still doth usurp upon the said State of Mississippi, to the great damage and prejudice of said State; whereupon the said David C. Glenn, attorney-general, as aforesaid, upon the relation aforesaid, for the State aforesaid, prays the advice of the court in the premises, and due process of law against the said Horatio H. Lindsey in this behalf, to be made to answer to said State of Mississippi, by what warrant he claims to have, use, and enjoy the liberties, privileges, franchises, and emoluments aforesaid, of said office of clerk of the penitentiary of said State, and clerk or secretary of said Board of Inspectors of said penitentiary.

DAVID C. GLENN, Att'y-Gen.

On the filing of said petition, the court made the following order:

"*David C. Glenn, Att'y-Gen., v. Horatio H. Lindsey.*

"On motion of David C. Glenn, Attorney-General of the State of Mississippi, and on the petition filed by him, on the relation of David N. Barrows, it is ordered that a writ of *quo warranto* be issued and executed on Horatio H. Lindsey, and be made returnable into this court, on Friday, the 17th day of March, 1854, commanding him to be and appear before this court on that day, and answer the petition aforesaid, and show by what warrant of law it is, that he holds and claims to exercise, the privileges and franchises, and to demand the emoluments of the office of clerk of the penitentiary of said State; and also the office of clerk of the Board of Inspectors of said penitentiary, which is incident or appurtenant to the office of clerk of said penitentiary."

On the 15th of March a writ was issued as follows:

"The State of Mississippi, Hinds county. To the Sheriff of Hinds county:

"David C. Glenn, Attorney-General of the State of Mississippi, on the relation of David N. Barrows v. Horatio H. Lindsey. Whereas, David C. Glenn, Attorney-General of the State of Mississippi, on the relation of David N. Barrows, hath filed in the

office of our Circuit Court for the county and State aforesaid, his petition, complaining that Horatio H. Lindsey, of said county, hath usurped from said State the privileges, franchises, and emoluments of the office of clerk of the penitentiary of said State, and as an incident thereto, the privileges, franchises, and emolument of clerk or secretary of the Board of Inspectors of said penitentiary, contrary to, and without any warrant of law, and continues to hold the same, refusing to surrender them to the party legally elected, and rightfully entitled to enjoy the same ; and whereas, by an order of said court, made upon the application of said attorney-general on the petition aforesaid, a writ of quo warranto was directed to be issued, returnable into our said court, on Friday, the 17th day of March, A. D. 1854, directed to said Horatio H. Lindsey, citing him to be and appear before our said court on the day last aforesaid, and then and there show by what warrant of law it is, that he holds the said office.   These are, therefore, to command you, the said sheriff of Hinds county, that you take the said Horatio H. Lindsey, if to be found in your county, and him safely keep, so that you have him before our said Circuit Court for the said county, at the court-house thereof, in the town of Raymond, on Friday, the 17th day of March, A. D. 1854, then and there to answer the said petition of the said David C. Glenn, Attorney-General of the State of Mississippi, on the relation of said David N. Barrows, and show by what warrant of law it is, that he holds the privileges, franchises, and emoluments of the office of clerk of the penitentiary of said State, and as an incident to, or appurtenant thereof, the privileges, franchises, and emoluments of clerk or secretary of the Board of Inspectors of said penitentiary. And have you then there this writ,'' &c.

Upon the return of the writ the defendant, Lindsey, moved the court to quash it, and to dismiss the information : 1. Because the writ was not issued and served five days before the first day of the present term of the court.   2. Because the writ was issued after the commencement of the present term, and is returnable to the same, and not to a succeeding term of the court.   3. Because the writ of quo warranto, except against incorporated banks, is prohibited by law.   4. Because said writ issued improvidently, and without any affidavit showing a sufficient cause for its issuance,

having been first made.  5. Because the information in the nature of a quo warranto, is prohibited by the laws of the State.  6. The attorney-general of the State, is not authorized by law, to file an information in the nature of a quo warranto.  7. The attorney-general is not authorized by law, to appear as plaintiff in behalf of the State or any other person.  8. The district attorney is the sole representative of the State in the Circuit Court.  9. The whole proceeding is null and void.

This motion was overruled, and thereupon the defendant demurred to the information; assigning for cause of demurrer, substantially the same grounds as were set out in his motion; and further, that the information was defective in not showing that any other person was entitled to the office.  The demurrer was overruled, and the defendant then pleaded, in substance, as follows.  He denied the usurpation of the offices, &c., as charged in the information; and relied upon his appointment to the clerkship of the penitentiary, by Governor Foote, on the 1st day of December, 1853, to fill the unexpired term of James M. Childs, who had been elected thereto and resigned, under which appointment he claimed to exercise and hold the office until a successor was duly elected and qualified; and he denied that any such successor, eligible to hold the office, had been elected and qualified to fill the same; he claimed the office of clerk of the Board of Inspectors, under an appointment from them; and he showed his commission from Governor Foote and the resolution of the Board of Inspectors, electing him as their clerk, as his warrant to exercise said offices.

The replication of the attorney-general averred that Childs was elected to the clerkship of the penitentiary on the 2d of February, 1852, for the term of two years from that date; that defendant, under his appointment, was entitled only to hold up to the 2d of February, 1854, and until a successor had been elected and qualified; that relator, D. N. Barrows, was elected on the 16th day of January, A. D. 1854, by the legislature to said office; and that, on the 15th day of February, A. D. 1852, he was regularly commissioned and qualified as such, and then demanded of the defendant the possession of said office, which he refused and still refuses to deliver.

The defendant demurred to this replication, and his demurrer

was overruled. He then rejoined, setting up special matter, and the plaintiff demurred, and his demurrer was sustained. Defendant then took issue on plaintiff's replication. As the rulings of the court on these demurrers are not noticed in the opinion, the pleadings demurred to are not set out.

The cause was finally, by consent of parties, submitted on the issue joined to the judge for decision, upon an agreed state of facts; which were in substance as follows : That the relator, D. N. Barrows, at the time of his election to the clerkship of the penitentiary, was, and now is, a pension agent of the United States. As a part of the agreed facts, the commission of Barrows was submitted to the court. The commission is as follows :

"To all who shall see these presents, greeting : Whereas, it appears by the returns received at the office of the Secretary of State, that David N. Barrows, by the joint vote of the Legislature, is duly and constitutionally elected to the office of Clerk of the Mississippi State Penitentiary : Now know ye, that in consequence thereof, and by virtue of the laws and Constitution of this State, we do authorize and empower him, the said David N. Barrows, to execute and fulfil the duties of that office according to law, and to have and hold said office, with all the powers, privileges, and emoluments, to the same of right appertaining, from the day of the date thereof, for the term prescribed by law." The commission was signed by the Governor and attested by the Secretary of State, and dated on the 15th day of February, A. D. 1854.

On the back of the commission was indorsed the oath of office of said Barrows, taken on the 18th of February, 1854.

The Circuit Court rendered a judgment of ouster, of the offices, against the defendant, and awarded them to the relator Barrows. From this judgment Lindsey appealed.

*John D. Freeman*, for appellant.

(No memorandum of General Freeman's argument has come into the possession of the reporter.)

*T. J. & T. A. R. Wharton*, for appellee.

The record presents a case of very rare occurrence. We have sought in vain for precedents directly in point. We can only apply

general principles, and reason from analogy.   We were not a little perplexed at the outset in framing these proceedings in the court below.   We hesitated before determining as to the form of the remedy; whether it was by writ of mandamus, or by an information in the nature of a writ of quo warranto.   We adopted the latter. We believe that the authorities upon which we rely fully sustain us in the opinion, that that is the proper remedy.   It would be quite unnecessary to reply to the numberless objections urged, by counsel for plaintiff in error, to the judgment of the court below.   Indeed, to attempt to do so, would exhaust the patience of your honors, and impose a very arduous and unprofitable labor on ourselves.   We shall barely state a few of the objections, and cite the authorities which we think contradict them.   We assume as axiomatic, that one of two remedies, alone exists in such a case.   We have stated above what they are: mandamus or quo warranto. The writ of mandamus presupposes a party rightfully in office, and commands him to perform some duty incident to said office, which he refuses to perform.   Where a person is in office by color of right, quo warranto, and not mandamus, is the proper remedy for another who claims.   Breese R. 68; 2 John. R. 190; 3 John. Ch. 79; 1 East R. 38.

I refer also, as to the cases in which mandamus and quo warranto are the appropriate forms of proceeding, to 3 Bacon, title Information (A); 6 Com. Dig. title Quo Warranto.

2. But it is objected, that this form of remedy is a criminal proceeding, and cannot apply in a case like the present, and that in Mississippi it is unknown in practice, except in relation to corporations, and then only by special statute.   We reply, that though a criminal proceeding in form, yet in substance it is a civil one.   2 Term R. 484; 2 Kyd on Cor. 439; 1 Sergt. & R. 385; 2 Yeates R. 429.; 1 Blackf. R. 272–274.

In every elementary work, which treats of this proceeding, a writ of quo warranto is defined to be in the nature of a writ of right for the king, against him who claims or usurps any office, franchise, or liberty, to inquire by what authority he supports his claim, in order to determine the right.   2 Black. Com. 262; 7 Comyn's Dig. 190.

For the common law power, as well as that conferred by the Eng-

lish statute on this subject, we refer your honors to the following authorities. Comyn's Dig. title Quo Warranto (A), (B); 3 Term. R. 596, 599, n. a; 5 Id. 85; 6 Id. 560; 2 East, 308; 6 Id. 359; 4 Id. 337; 3 Id. 119; 5 Term R. 85; Bull. N. P. 210, 211, 212; 5 B. & Ald. R. 771.

The English statute may be found in Bac. Abr. title Information (D).

This information will lie against an individual or corporation. Cas. K. B. 225; Bull. N. P. 212.

3. It is next objected, that instead of being presented in open court, and application made for the issuance of process, it should have been commenced by the filing of a complaint or petition in the clerk's office, as in ordinary cases, and the issuance of process by the clerk, returnable to the first day of the ensuing term.

This objection has no weight in itself, and is expressly overruled by the authorities. The proper practice was pursued in this case. The writ is not granted of course, but depends on the sound discretion of the court upon the circumstances of the case. And if dependent on the sound discretion of the court, it can only issue on its order, and not on application to the clerk, and on filing a complaint in his office. Vide 2 Str. 1196; 3 Burr. 1812, 1816; Bac. Abr. title Information (D); 2 B. & Ald. 339; 1 Anst. R. 178; 2 Dallas, 112; 2 John. R. 184; 1 Const. R. (S. C.) N. S. 271.

In speaking upon this subject, Bacon says, "Informations in the nature of a quo warranto may be and frequently are exhibited, with leave of court, for usurping privileges, franchises, &c. See 3 Bac. title Information (A).

When they are filed at the instance of an individual, it is usual to obtain leave of court. 3 Burr. 1565; 4 Id. 2089; 1 McCord R. 56; 1 East R. 40.

So by the express provisions of the statute 9 Anne, c. 20, it is enacted, "That where any person shall usurp any corporate franchise or office, it shall be lawful for the proper officer, with leave of court, to exhibit an information, quo warranto, against him, at the relation of any person desiring it, who shall be named therein, and on this the court shall proceed."

In accordance with the design of said statute, the Acts of 4 & 5 W. & M. were passed, which, recognizing the right of a relator, in

Lindsey *v.* The Attorney-General.

a case like that at bar, to apply to the court for the issuance of a writ of quo warranto, vests in the court a discretionary power in granting it, in order to prevent abuses of the privilege. The language of the courts of England, in construing the Statute of Anne, just cited, is, and has been uniformly, that the "view of that statute was, on the one hand, to facilitate and speed the removal of usurping officers, and pretended corporators; and on the other hand, to restrain all improper and vexatious prosecutions, by putting it in the power of the court to refuse their leave." In the case last cited, from 1 East, the court say, "That the statute of 4 & 5 W. & M. c. 18, has reposed in the court the same discretionary power over criminal informations; and though the words of that statute relate only to informations for trespasses, batteries, and other misdemeanors, yet it was holden, in the case of *Rex* v. *Morgan*, that under the word misdemeanors, it extends to informations in the nature of a quo warranto; for a usurpation of an office is a misdemeanor, &c. It is evident, therefore, that the court have a right to use their discretion, and to grant or refuse an application of this kind, according as they shall think it expedient or not."

4. The next error assigned, which we care to notice, is that the proceeding is instituted in the name of the attorney-general, on the relation of the party claiming the office, and it is said that the error here is twofold: 1st, That the attorney-general has no authority to appear in that behalf, and in that character, in such case; and 2d, That there can be no relator. The two may be considered in one view. The authorities applicable to the one, equally apply to the other; and we consider it necessary to do no more than collect such as bear on the point, and cite them without comment.

It is insisted, that the duties of the attorney-general are all prescribed by statute, and that his connection with suits, for or against the State, is limited to the Chancery Court and High Court of Errors and Appeals, and that the district attorney was the appropriate person to have instituted these proceedings. It surely cannot be worth while to reply to such a position. It is sufficient to say, that whilst the statute referred to, prescribes certain duties as appertaining to this office, it would be illogical to contend that there are not many others which it is equally incumbent upon him to perform. We venture the assertion, that scarcely a case can be

found in England, or in any of the States of this Union, in which any other officer has applied for such a writ, and it will be found almost as universal, that it has been on the relation of others, and those others the very persons who claim to be illegally deprived of the office in question, by the usurpation of the party holding such office. Besides, the officer in this case is a State officer, not a district one. The attorney-general is the law officer of the State; the district attorney of the particular district by which he is elected. There would be as much propriety and force in insisting that the district attorney of the most remote district in the State should have instituted these proceedings, as that the district attorney for the district in which the penitentiary is situated, should have instituted them. But again, even if the argument were well founded, that the attorney-general does not appear, and by statute is not required to appear, on behalf of the State, in the prosecution or defence of suits in the Circuit Court, it by no means follows that a citizen may not use his name in establishing his right to an office which belongs to the State, and the possession of which has been usurped by another. The authorities are innumerable, in cases of this kind, where the proceeding was filed in the name of the attorney-general on the relation of another. 2 John. R. 184; 4 Cowen R. 95, 358; 10 Mass. R. 295; 5 Id. 232; 5 Hamm. R. 358; 14 Serg. & R. 216; 4 Binney, 117.

5. It is also objected that the process was returnable to the same term at which the application was made. It need only be said, in answer to this, that the common law remedy was designed to supply a simple and summary mode of proceeding. The efficacy of the remedy depends upon its speedy administration. The term of the office in question is two years. That period would elapse during the pendency of the litigation, if it were assimilated to the ordinary rules governing in actions ex contractu.

It is decided by all the authorities we have met with, that the court, in the exercise of its discretion, will never grant leave to file the information, where it is apparent that the term would expire before the contest could terminate. But our statute regulating the issuance of process in ordinary civil suits, and requiring its return so many days before the commencement of the term, does not apply. 1st. Because it does not provide for this class of cases, in

enumerating the cases embraced by it.    2d. Because we have already seen that the information can only issue on application made in open court, whereas, the cases provided for by statute, contemplate the filing in the office of the clerk, in vacation, the declaration or complaint on which the process is issued, which is the first step taken, and which does not require the interposition or permission of the court.

The only other objection we shall notice is that founded on the fact, that at the date of his election and the filing of these proceedings, Barrows was pension agent of the United States, and it is said that this rendered him ineligible to the office in controversy, under that provision of the Constitution of the State, which declares that no member of Congress, or other person holding an office of profit or trust under the United States, shall hold any office of profit or trust under this State.    We do not care to discuss the question whether his acceptance of the office of clerk of the penitentiary would not, *ipso facto*, operate as a forfeiture of the pension agency (on this point see 3 Yeates R. 313; 2 Term R. 81, 87), which he was holding at the date of his election to the former office ; now that the provision of the Constitution does not render him ineligible, but only declares that he shall not hold, &c.    It might be argued, certainly with very great force as we think, that that provision of the Constitution clearly admits that a person may be elected to an office in this State, whilst holding one under the United States, though he could not hold the one to which he was so elected, until he had resigned the one he held under the United States.    But we maintain that the pension agency is no office, either in itself or in the contemplation of that provision of the Constitution.    Its very name imports that it is an agency as contradistinguished from an office.    The incumbent is appointed by the secretary of war, and is under his instructions in the discharge of the duties assigned him.    He takes no oath ; none is required by the Act of Congress giving the secretary of war the power to appoint.    There is no certain, fixed term, and no salary.    No commission is issued to him.    Neither the President nor the Congress of the United States has any control in his appointment or removal. Formerly the United States Bank and its branches, were the only pension agents of the government.    No individuals were or could

be employed in that service. Subsequently, by the Act of Congress of 1837, it was declared that the secretary of war should have power to appoint any corporation or person, pension agent. It is under that Act that the relator, Barrows, was appointed pension agent. That Act is still in force. We have no need of resorting to construction or implication in this matter.

Some at least, if not all of the following particulars, must concur to constitute any person an officer of the government of the United States, so as to bring him under the constitutional prohibition we are considering, viz., there must be some fixed term prescribed for his continuance in office; he must give bond, and take an oath, faithfully to discharge the duties of his office; a commission must issue, investing him with the authority to enter upon the office. Now it is obvious, that a corporation could not comply with some of these pre-requisites. Yet the Act of Congress, referred to above, authorizes the secretary of war to appoint a corporation pension agent; it is appointed in the same way, with the same powers and privileges, and by the same officer who appoints a natural person. No distinction, on this branch of the argument, can be drawn between natural and artificial persons, with respect to their competency to act as pension agents by appointment of the secretary of war, nor in the extent of the powers conferred upon them by such appointment. It would be absurd to contend that a bank falls under the prohibition of the Constitution we have quoted, when it is appointed pension agent. Not less absurd would it be, to contend that an individual falls under it when he is appointed.

But again, by parity of reasoning, it might be contended by those who raise the objection we have endeavored to answer on this point, that governors of States, and others, holding offices of trust and profit under State authority, could not act as visitors to the United States Military Academy at West Point, under appointment of the President. They receive compensation from the United States, are paid mileage, and probably per diem, as members of Congress. Yet the objection as to them was never heard of. Many other examples of similar character might be adduced.

If authority could be demanded, on a point which we think too clear to admit of doubt, it will be found in 4 Greenleaf's R. 481, in which the very question is discussed with masterly ability, and

decided in consonance with the position we maintain in this case. It is there said that a "manifest difference exists between an office. and an employment under the government. We apprehend that the term 'office' implies a delegation of a portion of the sovereign power to, and possession of it by the person filling the office, and the exercise of such power within legal limits, constitutes the correct discharge of the duties of such office. The power thus delegated and possessed, may be a portion belonging sometimes to one of the great departments of government legislation, judicial or executive, and sometimes to another. Still it is a legal power, which may be rightfully exercised, and in its efforts it will bind the rights of others, and be subject to revision and correction only according to the standing laws of the State. An employment merely, has none of these distinguishing features."

"It appears then, that every office, in the constitutional meaning of the term, implies an authority to exercise some portion of the sovereign power, either in making, executing, or administering the laws."

One of the most interesting cases we have met with in the books on this point, is that of *Respublica* v. *Dallas*, reported in 3 Yeates R. 300, where a similar proceeding was instituted against the defendant in error, who held the office of Recorder of Philadelphia, and of District Attorney of the United States. Distinguished ability is exhibited both in the arguments of counsel, and the opinion of the court. Without further elaboration, and passing by, without notice, very many other points strenuously urged by counsel for plaintiff in error, but which we think, with all deference, are not even incidentally involved in a proper inquiry into the merits of the case, we conclude by enumerating the authorities which may seem to show that, though a case of *first impression* in this court, the general principles applicable to this form of proceeding are well established. Before passing, however, from the point last suggested, to wit, the alleged incompatibility of a pension agency, and the clerkship of the penitentiary, I beg to refer your honors to the case of the *Commonwealth ex relatione Bache* v. *Binns,* 17 Serg. & R, 219, as conclusive of the question. A rule was taken against defendant in error to show cause why an information, in the nature of a quo warranto, should not be filed against him, to

inquire by what authority he exercised the office of alderman of Philadelphia. He was publisher of a newspaper; was appointed by the Secretary of State of the United States to print the resolutions and Acts of Congress in his State. On behalf of the relator it was contended that his acceptance of said appointment, disqualified him to act as alderman, aforesaid, because the two offices were incompatible under the Constitution of the State of Pennsylvania, Art. 2, sec. 8, and under the Act of 12th February, 1802, of said State. The terms and provisions of said Article of the Constitution and said Act are set out in the report of the case. They are much stronger than the language of our Constitution on the same subject. The court, throughout their opinion—which is characterized by great learning and ability—sustained all the positions we have assumed in this argument. They draw the distinction between an agency or employment, and an office. They cite many examples of State officers acting as agents, or performing service for the United States. They say that "Judges of State courts are appointed to take the evidence of the service of old soldiers to be pensioned (the very service, your honors will observe, which the relator here performs in virtue of his pension agency). Sheriffs, jailors, and public prisons are appointed and employed to perform the same duties to the federal government, in the safe keeping of criminals, which they owe to the State government." And again, "The question of incompatibility of offices is no new one. The established rule is to give the strictest possible construction to any part of the Constitution, and to any Act of the Assembly, declaring State offices incompatible with offices or appointments under the federal government, or declaring different State offices incompatible with each other, and never to hold anything to be within the prohibition unless expressed and named, and to take in no possible case by construction. This principle has been established by every authority known in the land, by the people in their elections, by the legislature in their appointments, by each separate branch of the legislature in their solemn decisions, by the governor in his appointments, and by the courts of law in their judgments." They then proceed to cite examples without number, of persons in that commonwealth, holding an *office* under the State authority, and an agency or employment under that of the United

States, and show that they are not incompatible; amongst others the case of General Bernard, being elected senator in Congress, while holding an office expressly named in the Constitution of that State, viz., secretary of the commonwealth, the duties of which he continued to exercise for some time after his election as senator; also the case of Mr. Dallas, reported in 3 Yeates R. 300. "He held a commission under the United States. He was, at the same time, Recorder of the city of Philadelphia, and, as such, his chief duty was that of judge of an important court of Pennsylvania. (It is the language of the court we are quoting.) The word in the Constitution under which the case was decided, is *judge*. Mr. Dallas was *judge*, in *effect*, in *name*, *Recorder*. The argument was identically this: that the Recorder of Philadelphia is a judge, and that the policy of the exclusion originated in a jealousy, lest the federal government should overshadow the State government; and if there was a doubt upon the subject, that policy required a decision affirming the incompatibility of the offices in question. But this court unanimously answered No; and held that the doubt and uncertainty of the letter was to have an operation directly the reverse."

To which we might add examples occurring in our own experience, and in our own State. General Speight was elected senator in Congress, whilst he was president of our State Senate; elected by the body of which he was a member, and continued to act as president until the adjournment of that session. Governor Foote was elected in November, 1851, governor of the State. He was then a senator in Congress, took his seat in the latter body on the 1st Monday in December, 1851, and occupied it until within a few days of his inauguration, which occurred on the — day of January, 1852. Governor Brown was elected a representative in Congress in November, 1849; he was at the time governor of the State, and continued to act as such until the — day of January, 1850, when his successor, Governor Quitman, was inaugurated. On the same day of the latter event, Governor Brown, probably in an hour after divesting himself of his gubernatorial robes, started to Washington, to take his seat as a representative under a commission issued to him, on account of his election on the first Monday of November, 1849, two months be-

fore he ceased to act as governor.   Precisely the same thing
occurred in the case of Governor Tucker.

FISHER, J., delivered the opinion of the court.

This was an information in the nature of a writ of quo warranto,
exhibited in the name of the attorney-general, on the relation of
David N. Barrows against Horatio H. Lindsey, in the Circuit Court
of Hinds county, alleging, that the said Lindsey had usurped, and
continued to hold, without authority of law, for a certain period,
the office of clerk of the penitentiary of the State, and as incident
thereto, the office of clerk of the Board of Inspectors of said insti-
tution.

The questions first presenting themselves for our consideration,
arise on the demurrer, which was filed to the information in the
court below, and overruled by the court.   The first point in order
is, whether the information, in the absence of any statutory regu-
lation, can be maintained in this State; or in other words, whether
it is the appropriate remedy for the aggrieved party in a case like
the present ?   A writ of quo warranto is defined in the books, " to
be in the nature of a writ of right for the king, against him, who
claims or usurps any office, franchise, or liberty, to inquire by what
authority he supports his claim, in order to determine the right."
2 Black. Com. 262; 7 Comyn's Digest, 190.   Owing to the great
length of the process, and the delay occasioned under the practice
which once prevailed, the ancient writ has fallen into disuse, and
the more modern method of proceeding by information, in the name
of the attorney-general, substituted in its stead.   The information
can be supported in all cases, where the ancient writ itself could
be maintained, the object being, by the change of practice, merely
to simplify and render more efficient the remedy, and not to extend
it, to new or different subjects.

It is however argued on behalf of the appellant, that the writ
at common law was only allowed at the option of the king; and was
not returnable into court, but before such persons as the king might
specially appoint for the purpose of trying the same.   Hence it is
argued, that as the remedy at common law was one which depended
mainly upon the pleasure of the king, and was not a judicial pro-
ceeding, it cannot be such in this country.   Blackstone says, that

the writ was originally returnable before the king's justices at Westminster, but afterwards only before the justices in eyre, by virtue of the statutes of quo warranto, 6 Edw. 1, c. 1; 18 Edw. 1, st. 2.    This authority appears to be sufficient to overturn the position of counsel, that the writ was not originally returnable into court.    But admitting for the sake of the argument, that the writ was grantable only at the pleasure of the king, according to the ancient practice, and that it was returnable before special commissioners, as argued by counsel, we still disagree with counsel, that the remedy, when pursued in this State, is not to be regarded as strictly judicial in its nature.    The king was interested, to a greater or less extent, in most, if not all the subjects touching which the writ was anciently employed as a remedy, and might therefore waive his own rights and privileges, growing out of either a forfeiture of a corporate franchise, or usurpation of an office.    Hence, it may have been proper that his pleasure should have been ascertained before the writ was allowed.

But in resorting to the common law, for the purpose of ascertaining either individual rights, or the remedies provided for their protection and enjoyment, we must always keep in view the difference in the structure in the two governments.    The common law, so far as it is recognized as a rule of action in this country, is founded in reason and good sense.    We look to it only to ascertain the nature and extent of rights, whether relating to persons or to property, and the remedies to protect these rights, or to redress such wrongs as may be inflicted upon them.    But having ascertained the right and the remedy as thus declared and defined, we turn to the constitution and laws of our own government, for the purpose of learning the tribunal before which the particular right must be vindicated, or the injury redressed.    The powers of the State government are divided into three distinct departments, and each of them confided to a separate body of magistracy.    The king, under the peculiar structure of the government of England, may have been intrusted with, or assumed to himself a larger share of the judicial power of the kingdom, than has been allowed to the executive department of this State.    His judicial power, whatever it may have been in the earlier days of the common law, would be treated here, as it has long been treated in England, as completely vested in the

courts of the State, who will exercise it, not arbitrarily, or according to a kingly prerogative at pleasure, but as regulated by law for the advancement of justice, and the preservation and protection of individual rights. It is unnecessary to state, that the controversy now before the court is entirely judicial in its nature; and that the Circuit Court, whose jurisdiction extends to all matters not specially confided to some other court, is the tribunal before which the remedy must be prosecuted.

But little more need now be said to dispose of the question. It is a familiar maxim of the law, that wherever there is a legal right, there is also a legal remedy to enforce it. The office of clerk of the penitentiary was created by statute. The law, in consideration of the services to be performed, has given to the incumbent certain fixed compensation. The person legally elected and qualified, has the right to hold the office, and to the enjoyment of its honors and emoluments, to the exclusion of every other person. It is unnecessary to say, that this is a legal right, to enforce which the law has provided a legal remedy. Whenever the nature of the right will admit of it, the law will give the injured party a perfect and complete remedy, by which we understand, that it will place the party in the possession and enjoyment of the thing or right to which he is adjudged to be entitled. The right asserted here, is of this character. It is entirely within the power of the court, by its judgment, to oust the party who has usurped, and continued illegally to hold the office, and, at the same time, to award its possession and future enjoyment to the relator. The writ of quo warranto, as we have seen, was the only means by which this could be done at common law; and the information having been substituted as the more simple method, is now the usual and appropriate remedy.

The point next in order for consideration is, that there is no authority, as argued by counsel, for filing the information in the name of the attorney-general; as it is said he is not the representative of the State in the Circuit Courts. Perhaps if we were to confine our examination entirely to his powers and duties, as defined by the statutes of the State, we would agree with counsel. It is sufficient, on the present occasion, to say, that there is nothing in the law or in the nature of his duties, prohibiting the use of his name; and it has been the long and unvarying practice, not only in England,

but in most, if not all the States of the Union, for such informations to be exhibited by the attorney-general. It is a matter of but little consequence whose name may be used, so that a meritorious case is presented to the court, and substantial justice can be administered between the real parties to the controversy. This can be accomplished as well by proceeding in the name of the attorney-general, as of the State, or of the party directly interested; the object being to determine who has the legal right to hold the office. The common law itself, is but the result of long practice, which may, from time to time, undergo such alterations or improvements as experience may suggest, for the purpose of rendering the administration of justice more certain or less expensive. Admitting, for the sake of the argument, that the attorney-general is not the representative of the State in the Circuit Courts, it does not necessarily follow that his name may not be used when required by a citizen, who has a clear right to an office, but can only pursue his remedy to assert his right in the name of this officer of the State. The questions are : has the relator a right to the office ? has this right been withheld or denied him by any other person ? is there a remedy for the recovery of the right ? if so, in whose name must it be pursued, and in what manner must it be prosecuted ? As already remarked, the common law permitted the injured party to seek redress of the wrong in the name of the attorney-general. The remedy in this instance, as we have seen, is entirely regulated by the common law; and hence, according to the well-recognized rules of construction of statutes, unless there is something in them taking away this right of the citizen, or making the duties of the attorney-general incompatible with the use made of his name in the present proceeding, we shall feel ourselves bound by the practice on the subject. The statutes prescribing his duties are all affirmative, and merely designate what duties he shall perform as the officer of the State. He is not prohibited from performing others, in which a citizen alone may be interested; or, if not interested, then the State is, provided the fact can be established as alleged, that the defendant below had, without authority of law, usurped the office described in the information. We therefore overrule this objection.

It is next urged, as an objection, that the writ was issued in term

time, and made returnable to the same term of the court. What we have already said, will aid very much in disposing of this objection. There is nothing in the statute law regulating the process in this class of cases. The ancient writ itself, having been found by experience to be inconvenient in practice, has fallen into disuse, and the more simple method of filing the information under leave of the court, and summoning the party by ordinary subpœna, substituted in lieu of the ancient practice. It is true that a rule nisi, stating the objections to the defendant's holding the office, usually accompanies the subpœna; but this is not necessary where, as in this case, the process itself stated what was alleged in the information. The writ as once used, was in the nature of a criminal proceeding, the information is in form such now, but is used only for the purpose of trying a civil right.

If then we regard the process in the nature of a subpœna or of criminal process, either can issue in term time, and be made returnable instanter. The very nature of the right asserted requires a speedy remedy. It is not only the right of the party having the legal title to the office, to be placed at once in the possession and enjoyment of it; but it is also the policy of the law, that he alone who has been intrusted with the public confidence, in the mode pointed out by law, should perform the duties of the office. The remedy, to be valuable, should be speedy. It was so under the practice as regulated by the rules of the common law; and having to look to that law for the rules to guide us on the present occasion, we find nothing in the policy of the law, or the theory of our government, requiring us to make the remedy less efficient than it is under the English practice. We therefore find no error in the action of the court below, so far as this objection is concerned.

Having thus disposed of the main points, that the remedy by information in the nature of a writ of quo warranto, is the proper one, that the proceeding may be commenced and carried on in the name of the attorney-general, and that an information may be heard at the same term of the court to which it is filed, we deem it unnecessary to notice the other grounds taken on the motion to quash the information, or in the demurrer.

We therefore proceed to the consideration of the two remaining points arising on the merits, to wit: whether the relator, Barrows,

has sustained his title to the office by sufficient legal evidence; and second, whether the fact of his being pension agent for this State, both at the date of his election and at the time he demanded possession of the office from the appellant, disqualified him from holding an office under the State government, under that provision of the Constitution which declares that no member of Congress, or other person holding an office of profit or trust under the United States, shall hold any office of profit or trust under this State.

With respect to the first point, the relator exhibited, to support his title to the office, a commission by the governor, and signed by the secretary of state, and otherwise properly authenticated, on the 16th day of February, 1854, by which it appears that Barrows, the relator, had been elected to the office in controversy. But it is objected, that the commission omits to show at what time he was elected, and that it is therefore void for this uncertainty. That is certain which may be rendered certain. Hence our inquiry must be, whether the commission can be rendered sufficiently certain to establish the relator's claim to the office. It is contended that he may, for anything that appears to the contrary, have been elected before Lindsey's appointment. Admitting this construction to be true, it would only serve to show that there was no vacancy in the office, and that Lindsey's appointment was therefore void. But there is another and safer rule by which the question may be solved. The commission was issued by the present governor. The court must take judicial notice of the changes made in the executive department. The governor was inaugurated on the 10th of January, 1854; the commission was issued after this date. There was no meeting of the legislature which could elect, after Lindsey's appointment, until the first Monday in January, 1854. These several facts, then,—Lindsey having been appointed by the governor in the recess of the legislature to fill a vacancy, the legislature meeting after his appointment, it being part of its duty to elect a clerk of the penitentiary, and the governor who succeeded Governor Foote having, after the meeting of the legislature and his own inauguration, commissioned the relator as such clerk, in virtue of a legislative election,—must be taken as sufficient evidence that the election took place by the legislature at its late session, and therefore sufficient.

In regard to the other question, the fact that the relator was pension agent of this State, both at the date of his election and of his application for possession of the office, it will be sufficient for us to state our conclusion. We have examined the several Acts of Congress on the subject, and are of opinion, that he is not, in a legal sense, an officer of the government of the United States. He is not required to take an oath of office, or to perform any other services than such as may be confided to him by the war department, of which he is merely for this special business an agent.

Upon a careful review of the whole case, we are of opinion that the judgment of the court below ought to be affirmed.

Judgment affirmed.

A petition for a reargument was filed, but overruled.

[This cause was decided at the April Term, A. D. 1854.]