[No. 32077. Department One. May 1, 1952.]

HAROLD E. FITTS et al., *Plaintiffs and Relators*, v. J. A. GIBBS et al., *Defendants*, CHESTER BATES, *Intervener*.[1]

[1]Reported in 244 P. (2d) 241.

L. C. *Brodbeck*, for plaintiffs and relators.

*Charles O. Carroll* and *K. G. Smiles,* for defendants and respondent.

*Fred W. Catlett, Catlett, Hartman, Jarvis & Williams,* and *John N. Rupp,* for intervener.

MALLERY, J.—The plaintiffs, by petition, brought two causes of action in the superior court of King county, and seek, in this court, to have adverse judgments upon both reversed.

We will dispose of plaintiff relators' second cause of action first. By it they sought to invalidate a King county budget appropriation for the "King County Freeholders' Commission."

That part of the twenty-first amendment to the constitution of the state of Washington pertinent to this case reads:

" . . . Any county may frame a 'Home Rule' charter for its own government subject to the Constitution and laws of this state, and for such purpose the legislative authority of such county may cause an election to be had, at which election there shall be chosen by the qualified voters of said county not less than fifteen (15) nor more than twenty-five (25) freeholders thereof, as determined by the legislative authority, who shall have been residents of said county for a period of at least five (5) years preceding their

election and who are themselves qualified electors, whose duty it shall be to convene within thirty (30) days after their election and prepare and propose a charter for such county. . . . "

Pursuant to this amendment fifteen freeholders of King county were elected on November 7, 1950, to "frame a 'Home Rule' charter for its own government subject to the Constitution and laws of this state."

The freeholders met and organized on December 4, 1950, designating themselves as the "King County Freeholders' Commission," and proceeded with their duty of framing a charter for King county. At their instance and request the King county commissioners, in the budget for 1952, made the following appropriation:

"Freeholders Committee:
Printing and Supplies............ 2,309.24
Charter Consultant ............. 1,500.00"

The item "Charter Consultant" was later changed to "technical and clerical assistants."

The plaintiff relators contend that King county cannot pay for such budget items on behalf of the "Freeholders," because they (1) are not county officers, and (2) are not performing a county function. We do not agree with either contention.

The test of a public office of a civil nature is laid down in *State ex rel. McIntosh v. Hutchinson,* 187 Wash. 61, 59 P. (2d) 1117, 105 A. L. R. 1234, wherein we quoted, with approval, *State ex rel. Barney v. Hawkins,* 79 Mont. 506, 257 Pac. 411, 53 A. L. R. 583, as follows:

" 'After an exhaustive examination of the authorities, we hold that five elements are indispensable in any position of public employment, in order to make it a public office of a civil nature: (1) It must be created by the Constitution or by the legislature or created by a municipality or other body through authority conferred by the legislature; (2) it must possess a delegation of a portion of the sovereign power of government, to be exercised for the benefit of the public; (3) the powers conferred and the duties to be discharged must be defined, directly or impliedly, by the legislature or through legislative authority;

(4) the duties must be performed independently and without control of a superior power, other than the law, unless they be those of an inferior or subordinate office, created or authorized by the legislature and by it placed under the general control of a superior officer or body; (5) it must have some permanency and continuity and not be only temporary or occasional. In addition, in this state, an officer must take and file an official oath, hold a commission or other written authority, and give an official bond, if the latter be required by proper authority.' "

That the "Freeholders" meet the first four tests, as quoted above, is too apparent to require discussion.

As to the fifth test, we hold that the "Freeholders" have a definite term of office, even though it does not end upon a predetermined calendar date. It terminates with the fulfillment of the constitutional mandate to them to "prepare and propose a charter for such county." Though the terminal date is not yet known, yet it is legally certain when it can be definitely fixed by reference to an event that is not contingent in nature. The "proposal" will certainly occurr upon a particular date. That is sufficient to meet the fifth test quoted above.

We, therefore, find that the "Freeholders" are public officers of King county. *Marxer v. City of Saginaw,* 270 Mich. 256, 258 N. W. 627.

From this it follows that the "Freeholders," in performing their constitutional duty on behalf of the county, are performing a county function. It was the right and the duty of King county to implement their services by the appropriation in question.

The judgment on the second cause of action is affirmed.

The facts pertinent to plaintiff relators' first cause of action are as follows:

On December 26, 1951, the prosecuting attorney, on behalf of the "Freeholders," requested the county commissioners to pass an emergency appropriation to supply an additional civil deputy prosecuting attorney to serve the "Freeholders" exclusively for a period of six months. The county commissioners acceded to their request, and by reso-

lution No. 13133 appropriated the sum of $3,240 for that purpose.

RCW 36.27.020 (2) [*cf.* Rem. Rev. Stat., § 4132] provides, *inter alia:*

> "The prosecuting attorney shall: . . .
>
> "(2) Be legal adviser to all county and precinct officers and school directors in all matters relating to their official business, . . ."

It thus appears that our holding that the "Freeholders" are county officers performing a county function casts the duty of advising them legally upon the prosecuting attorney.

However, the plaintiff relators contend that the emergency appropriation for an extra deputy was not, in fact, an emergency and, hence, was invalid. The regularity of the legal steps in making the emergency appropriation is not questioned. The factual background concerning it is as follows:

On July 9, 1951, the "Freeholders" requested the prosecuting attorney to provide them with legal advice. He was unable to do so with his existing staff, and requested help from the attorney general. On July 30, 1951, the attorney general agreed to supply it, and appointed a special assistant to advise and assist the "Freeholders." Assuming that the attorney general's office would perform the work, the prosecuting attorney made no request for funds in his 1952 budget for that purpose. As it turned out, however, the assistant attorney general designated for the task was unable to perform the promised services, and resigned on December 3, 1951. Upon the "Freeholders" again requesting legal assistance from the prosecuting attorney, he, being unable to provide a deputy for that purpose from his regular staff, requested that the county commissioners make an emergency appropriation of $3,240 to pay for an additional civil deputy for six months. On January 8, 1952, the county commissioners passed a resolution declaring an emergency and calling a hearing thereon. On January 21, 1952, the commissioners held the hearing and unanimously adopted

resolution No. 13133, from which action plaintiffs appealed to the superior court.

The plaintiff relators contend that the *need* of the legal services was foreseeable, and, therefore, not an emergency. With this we may well agree. However, the prosecuting attorney was justified in relying upon a commitment from the attorney general's office to supply the legal services. He was not bound to anticipate such a contingency as occurred in this case, because it was beyond his control. Had the contingency not occurred, no appropriation would have been necessary, and, hence, he properly omitted it from his budget. Resolution No. 13133 was not arbitrary or capricious, because the necessity was thus reasonably unforeseeable. *State ex rel. Porter v. Superior Court*, 145 Wash. 551, 261 Pac. 90.

The judgment in the first cause of action is also affirmed.

GRADY, HILL, and WEAVER, JJ., concur.

SCHWELLENBACH, C. J. (concurring in the result)—I agree that the freeholders are performing work of a public nature, and are thus entitled to legal advice from the prosecuting attorney. But I do not agree that they are public officers.

This court has found that the following were not public officers: deputy county clerk, *Nelson v. Troy*, 11 Wash. 435, 39 Pac. 974; commissioners appointed to assess benefits, *Bilger v. State*, 63 Wash. 457, 116 Pac. 19; schoolteachers, *State ex rel. Board of Directors of School Dist. No. 306 v. Preston*, 120 Wash. 569, 208 Pac. 47; district administrator of W. P. A., *State ex rel. McIntosh v. Hutchinson*, 187 Wash. 61, 59 P. (2d) 1117; officers of Washington national guard, *State ex rel. Hand v. Superior Court*, 191 Wash. 98, 71 P. (2d) 24; court reporters, *State ex rel. Brown v. Blew*, 20 Wn. (2d) 47, 145 P. (2d) 554; members of state legislative council, *State ex rel. Hamblen v. Yelle*, 29 Wn. (2d) 68, 185 P. (2d) 723. Yet all of these individuals or groups were performing work of a public nature and no question was ever raised concerning any appropriation to permit them to function for the public benefit.

In the *Hamblen* case this court stated that all five of the elements mentioned in the test referred to in the *McIntosh* case must be present. As to subdivision (2), "it must possess a delegation of a portion of the sovereign power of government, to be exercised for the benefit of the public," we said:

"The council members will not legislate, execute, or administer laws enacted by them. The only power of the legislative council is to collect information and report as to the facts it finds to the next legislature and to make its reports public."

Likewise in the instant case the freeholders will not legislate, execute or administer laws enacted by them. They will merely *prepare* and *propose* a charter. The right to recommend amounts to nothing more than the right to advise. *Kingston Associates v. La Guardia*, 281 N. Y. S. 390, 156 Misc. Rep. 116.

I do not agree with the majority that subdivision (5) of the test has been met; "it must have some permanency and continuity and not be only temporary or occasional." Surely this group has neither permanency nor continuity. Its functions are only temporary and continue only until it has performed the duties required of it. *People ex rel. v. Garfield County Court*, 59 Colo. 52, 147 Pac. 329, in holding that commissioners appointed to call and hold an election upon the question of incorporation of a town were not public officers, said:

"The positions held by these commissioners were transient in their nature, and ceased to exist upon the full performance of the few duties attached to them. They lack the essential elements of public offices which 'embrace the ideas of tenure, duration, emolument and duties.' *In the Matter of House Bill No. 186*, 9 Colo. 628, 21 Pac. 473; *U. S. v. Hartwell*, 6 Wall. 385, 18 L. Ed. 830."

The majority relies upon *Marxer v. City of Saginaw*, 270 Mich. 256, 258 N. W. 627, a Michigan case. The Michigan statute provided for a Charter Commission, the members of which took a constitutional oath of office; had power to fill vacancies in its membership; choose its own officers;

call the election; post notices of election; provide for polling places; and appoint inspectors of election, and a canvassing board to canvass the election. There is no question that they met all the tests of public officers. It is true that the freeholders here have designated themselves as the "King County Freeholders' Commission." But they had no legal right to so designate themselves. Their election did not change their status in the least. They were still freeholders, residents and qualified electors of King county.

I am of the opinion that the idea of the constitutional amendment is to permit the people, as members of the public, to prepare and propose a charter, rather than to permit this to be done by public officials.

[1]Reported in 244 P. (2d) 260.